**RECEIVED**

NOV - 1 2021

**U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS**

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MISSOURI

TONY R. LITTLE,

        Plaintiff,

vs

UNITED STATES DEPARTMENT OF DEFENSE,
UNITED STATES DEPARTMENT OF STATE,
Diplomatic Security Service,
UNITED STATES DEPARTMENT OF THE TREASURY,
Secret Service Agency,
UNITED STATES DEPARTMENT OF JUSTICE,
Federal Bureau Of Investigation,
UNITED STATES CENTRAL INTELLIGENCE AGENCY

        Defendants.

## COMPLAINT FOR DAMAGES PURSUANT TO TITLE VII AND 42 U.S.C. 1983, and 1985 THE FIRST AMENDMENT, FOURTH AMENDMENT, SIXTH AMENDMENT, EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT, AND TORT CLAIMS

        Plaintiff bring this complaint pursuant to Title VII for violations of his First Amendment, Fourth Amendment, Sixth Amendment, and Fourteenth Amendment Rights Of the United States Constitution and 42 U.S.C. 1983, and 1988, and 28 U.S.C. 1343, and for Defamation under the states tort claims act. Plaintiff In Pro Se alleges as follows:

1·

## JURISDICTION AND VENUE

1.       Jurisdiction and venue are proper in United States District Court and in states pursuant to 42 U.S.C. 1983, and 1988, and 28 U.S.C. 1343 and 1391. Supplemental jurisdiction over states tort claims is proper pursuant to 28 U.S.C. 1367(a). All of the parties reside or do business within states of the United States, and the acts complained of occurred within states of the United States, and involved a foreign government.

2.       The jurisdiction of this court is invoked pursuant to the Constitution of the United States, 28 U.S.C. 1343 (1.), (2.), (3.), and (4.), and 28 U.S.C. 1331 and 1391, and 28 U.S.C. 1361. The rights, privileges, and immunities sought herein to be redressed are Plaintiff's rights secured by the First Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, the Equal Protection Clause Of The Fourteenth Amendment of the United States, 42 U.S.C. 1983, and provisions of the states tort claims act.

## PARTIES

3.       At all times material, Plaintiff Tony R. Little, Date of Birth October 23rd, 1955 was (AKA) Tony R. Whittaker, Date of Birth October 23rd, 1950, is, and was a United States citizen by birth, an African American man now current resident of the State of Missouri.

4.       At all times material, Defendant  United States Department Of Defense, was and is an executive branch of the United States Government, empowered with coordinating and supervising all agencies and functions under its control directly related to United States Armed Forces and national security.

5.       At all times material, Defendant United States Department Of State, was and is an executive branch of the United States Government, and have direct control over functions of the Diplomatic Security Service and all agents/officers empowered in their duties.

6.       At all times material, Defendant United States Department of The Treasury, was and is an executive branch of the United States Government, and have direct control over Functions of the Secret Service Agency and empower all agents/officers in their duties.

7.       At all times material, Defendant United States Department Of Justice, was and is an executive branch of the United States Government, who empower Federal Bureau Of Investigation and all agents/officers in their duties.

8.      At all times material, Defendant United States Central Intelligence Agency, was and is an executive branch of the United States Government, and have direct control over functions of their agents/officers empowered in their duties.

## HISTORY OF FACTS

9.      Plaintiff Tony R. Little, was born of a family whose mother, other members of her family, Plaintiff's father, and especially step father were actively involved with U.S. Military and U.S. Intelligence Agencies a part of the military and separate since on or about late years 1940s thru on or about 1978, the year Plaintiff's step father was killed in Kansa City, Missouri, deaths of other family members in 1995, older brothers and one(1) of older sisters 2001, and 2020, and death of Plaintiff's mother in 2016.

10.     Plaintiff's family mentioned in paragraph (9.), were a part of many members of a group with various ethnic and military backgrounds, handled by U.S. Military and Intelligence operatives that began a Program, creating a society network within and among the normal society. Plaintiff became aware of the name involved with the Program involved. Plaintiff's allegations complain the malicious and dangerous acts committed by certain member faction of the Program who engaged in intentional deprivation of Plaintiff's Constitutional Rights, Privacy and Defaming him, using including criminal and terroristic acts maintaining control over Plaintiff, and ultimately create his demise in a manner that will appear Plaintiff caused upon himself, and no involvement by the Program.

11.     Plaintiff affirm! The illegal methods of operation by members of aforementioned Program in Paragraph (10.), is "Create Controversy", "Create Confusion", "Create Chaos ", "Create Conflict And Demise"! Plaintiff's life and liberties, privacy and defamed was committed by the Program of the Defendants involved. No person/citizen is exempt from described methods of members of the Program when placed on a citizen/person targeted for destruction of their lives and demise, including elimination.

12.     Plaintiff became targeted by Defendants Program and operatives involved because of Plaintiff being one of older children in his family who have knowledge regarding original actions of the Program and certain operatives aforementioned in

3

Paragraphs (10.], and (11.) as would apply to the first Big Five cities including Chicago, Illinois, Dallas, Texas during the, Lee Harvey, era.

13.        During Plaintiff's childhood years, he was given many various types of religious books and language books to read and study, after his regular school lessons. On or about July 22nd, 1970, Plaintiff graduated the 8TH grade from Amos Alonzo Stagg Elementary School, located at 7400 So. Morgan Street, Chicago, Illinois, under his birth Name, Tony R, Little,  Date of Birth October 23rd, 1955., Plaintiff was to attend Tilden Technical High School. Instead courses were paid for Plaintiff to attend Central Y.M.C.A. High School located at 19 So. La Salle Street, Chicago, Illinois.

14.        On or about November, 1970 Defendants of the Department Of Defense Intelligence agencies aided in arranging Plaintiff's identity to be, Tony R. Whittaker, Date of Birth October 23rd, 1950, and his step father's name information. Both information of Plaintiff's birth, and arranged, was held by Social Security Administration.

15.        On or about January, 1971, thru May, 1971, Defendants Department of Defense Intelligence Agencies arranged training that involved Plaintiff, as part of an experiment through W. L. Lillard Bureau of Investigations, Chicago Police Department, and U.S. Military persons from Special Operations at Ft. Bragg, North Carolina, where Plaintiff's oldest brother had been stationed and discharged after several Tours in Vietnam.

16.        On or about June, 1971, Plaintiff was issued (2) two identifications that included badge and matching number hat shield, and for when working moonlighting With Officers from Chicago Police 3rd, and other Districts at a Police nightclub on Chicago's Southeast side, and a .38 Caliber (4) four inch Revolver.

17.        On or about June, 1971, Plaintiff began working in a law enforcement and security capacity working non uniform assigned  U.C. duties including Decoy, Robbery Suppression in areas of Chicago Hotspots. Plaintiff also worked as "Shadow",  part of Witness Protection and V.I.P. Dignitary assignment. Plaintiff arrested, assisted in arresting, and or, caused the arrest of many suspects.

4

18.        On or about February, 1972, Plaintiff received his Firearm Owners
Identification Card, from State Of Illinois Department of Law Enforcement, expired 1978.
Plaintiff Purchased a .38 Caliber (4) four inch Revolver from the police uniform and gun
store located (1) block south of former Chicago Police Headquarters, 1121 So. State.

19.        On or about December, 1972, Plaintiff received a .22 Caliber bullet 2ound to
the palm of his right hand during  disarming a robbery suspect, and taken to Englewood
Hospital, Chicago, Illinois. Plaintiff also received a stab wound in his right thigh area
during a separate incident involving attempting to arrest a suspect.

20.        Plaintiff had began living a double life as an adult working duties, and tried to
maintain a degree of his life as still a teenage minor according to State of Illinois Laws.
Plaintiff accepted invitation from his teenage friend and neighbor for a blind date at his
High-school  function on or about October, 1972. Plaintiff's blind date was, Romelle
Taylor, daughter of Cook County Sheriff's Deputy, Frank Taylor Sr..

21.        On or about February, 1973, Deputy Frank Taylor Sr. discovered Plaintiff was
working in a law enforcement capacity and dating his daughter who was not 18 years of
age until May, 1973. Upon Deputy Frank Taylor Sr. investigating further discovered
Plaintiff was actually (5) five months younger than his daughter, Romelle Taylor, and
should not be working in any  type of law enforcement capacity.

22.        On or about March, 1973,  Defendants United States Department Of Defense
Intelligence Agencies,  and Chicago Police Special Operations, used (1) one of their
criminal operatives knowingly driving a stolen vehicle for framing other citizens, did
commit same incident on Plaintiff.  Plaintiff was advised  by (Tip) information a suspect
near where Plaintiff was standing was driving a stolen vehicle. Plaintiff opened the
passenger door confronting the suspect, who then began speeding away with Plaintiff
leaning inside the vehicle.  Plaintiff gained complete entry into the passenger side of the
vehicle and identified himself ordering the suspect to stop the vehicle. The suspect
refused to stop and Plaintiff observed a Chicago Police vehicle had entered driving
behind suspect, and Plaintiff displayed his identification to the officers in hope of
immediate assistance. Instead of assisting Plaintiff, one of the officers from Special
Operations of a different area, fired his weapon several times at Plaintiff attempting to
eliminate Plaintiff. The officer stopped firing his weapon only when other Chicago Police
vehicles arrived. The officer later told Plaintiff, " You Should Go To Church, I Don't  Know

5

Why I Missed You "! Plaintiff was charged with crimes in cover-up, Defendants used, and continued using over the years despite the charges dismissed, and no court record exist.

23.        On or about April, 1973, all charges was dismissed S.O.L., and NON SUIT, including weapons and weapons possession.  Plaintiff advised he wanted to maintain his law enforcement capacity and duties he loved. Deputy Frank Taylor Sr. also became aware of the incident and discrepancy involved regarding Plaintiff being entrapped and framed being wrongful and discussed assured safety of his daughter to Plaintiff.

24.        On or about October, 1973, Plaintiff registered at the Selective Service Board located at 3900 W. Pershing Rd., Chicago, Illinois. On or about December, 1973, Plaintiff was advised by his mother, his supervisors and United States Army Recruiters, he must enter U. S. Military Service and his work and duties  in law enforcement would be sustained upon his Honorable Discharge. On or about January, 1974, Plaintiff enlist in the United States Army prepared by same recruiters in Chicago, Illinois.  Plaintiff was sent to Fort Leonard Wood, Missouri for his basic training.

25.        On or about April, 1974, Plaintiff was advised by the U.S. Military Pay Master, he was not receiving his military pay because of a security clearance conducted by Defendant United States Department Of Defense, and Defendant United States Department Of Justice, Federal Bureau Of Investigation, Plaintiff was referred to U.S. Army Military Police and their Criminal Investigations Division for assistance to clear any discrepancies. Plaintiff began to understand how the recruiters prepared his entry Into the U. S. Military was disingenuous and maintaining a cover up protecting Defendants U.S. Department Of Defense Intelligence Agencies, State Of Illinois Department Of Law Enforcement, Cook County Sheriff's  Department, Chicago Police Department, W.L. Lillard Bureau of Investigations,  and Plaintiff's mother who was deceived knowingly and willingly.

26.        On or about May, 1974, Plaintiff had completed his A.I.T. Training for his Enlisted M.O.S. 12 B 20 Combat Engineer, for his permanent duty station at Fort Ord California, and was not given his Enlistment Guarantee when he enlisted. Instead, Plaintiff was forced to remain at Fort Leonard Wood, Missouri without pay for (4)four more months until Defendant United States Department of Defense, U. S. Army finally Honorably Discharged Plaintiff, on or about September, 1974. Plaintiff left Fort Leonard Wood with only a few savings bonds he had. Plaintiff was also discharged with same Identity information Defendants themselves arranged described in Paragraph (14).

27.        On or about September, 1974, Plaintiff arrived home Honorably Discharged from Fort Leonard Wood, Missouri, and U.S. Military Service Duties and immediately

6

returned to his former work assignment duties in a law enforcement capacity, and
working the police nightclub. Additionally, Plaintiff's eldest brother, aforementioned in
Paragraph (15.), advised Plaintiff his supervisors at the United States Postal Service,
Chicago Main, Congress Expressway, would get Plaintiff employment as a Mail Handler
(89 Day N.T.E.) position. Plaintiff accepted the position to aid in needed cost to purchase
his house for his )19th)(nineteenth birth October 23rd, 1974. Mortgage company in San
Diego, California. Plaintiff was issued a locker to secure his guns, handcuffs, and other
gear because of his regular work duties before arriving to work his 3pm to 11pm shift at
the post office, and sometimes Plaintiff's continued work duties after leaving work at
the post office.

28.      On or about 1975, Plaintiff met with Romelle Taylor again , who advised her
father, Deputy Frank Taylor Sr. had been killed supposedly during his work duties as a
Sheriff's Deputy. On or about January, 1975 Plaintiff became aware Defendants United
States Department of Defense Intelligence Agencies, were also aided by Military
Police/C.I.D., and was with Plaintiff's eldest brother in the police nightclub where
Plaintiff was working, and when the nightclub closed, Defendants were waiting in a
vehicle behind a Chicago Police vehicle with Plaintiff's  eldest brother sitting insid former
e the rear seat. The police officer asked Plaintiff for his true age identity saying, " I Have
Been Advised You Are A Minor "!  Police officers working with Plaintiff were amazed in
awe as Chicago Police Sergeant and the police officer disarmed Plaintiff of his guns,
handcuffs,  both badges and identifications, and placed Plaintiff under arrest for,
Unlawful Use Of Weapons, alleging Plaintiff was a minor in possession of firearms.

29.      On or about January 12th, 1975, Plaintiff attended court located at Chicago
Police Headquarters, 1121 So. State St., Chicago, Illinois. The Chicago Police Officer who
arrested Plaintiff sat on the bench in court holding the large evidence bag
containing Plaintiff's guns, identifications and gear shaking his head side to side smiling.
Plaintiff's name was called by the presiding court judge, and immediately said,
"Dismissed" when Plaintiff answered. Plaintiff was given the same large evidence bag,
and Plaintiff immediately went to the bathroom outside of the courtroom, put on all of
his guns, gear, and identifications and proceeded to work.

30.      On or about July, 1977 Plaintiff tried to leave all of his work, his family and
United States Department of Defense Intelligence Agencies influence on his life, and
tried to begin a separate life of his own. Plaintiff had learned Defendant's  United States
Army Records Center, St Louis, Missouri, maintained the cover up information in
Plaintiff's record file, and allowed all Defendants herein, and any other departments or
agencies who used said defamatory information in intentionally defamimg Plaintiff as a

7

Criminal in Felony, Grand Theft, and Assault on police, and created danger for Plaintiff.

31.         Plaintiff began to know Defendants United States Department Of Defense Intelligence Agencies, aided also by Its Military Police/C.I.D., had already been a part of operating the Program aforementioned described in Paragraphs (10.), (11.), (12.), and created false profiles of Plaintiff involved in Grand Theft, Aggravated Assault on Police, and added additional false information Plaintiff possibly involved in Burglary, Robbery, Drugs, Child Crimes, Gang Affiliations, and even use a profile Plaintiff had been incarcerated in Fort Leavenworth, Kansas, and was on Parole, and a connection to Vietnam,  as Plaintiff's eldest brother in Special Operations.

32.         United States Department Of Defense, Intelligence Agencies, including Military Police/C.I.D. formed a Cabal involving all Defendants herein, and Defendant's Program members, in a campaign against Plaintiff's Constitutional Rights, Privacy, Employment, and forced Plaintiff's life under Defendants continuous scrutiny and control. United States Military had no Constitutional Authority to engage in a Police capacity on Plaintiff. Defendants involving Military Police/C.I.D.,  used fake profiles described in Paragraphs (30.) , and (31.), in each jurisdiction of state, county, and municipal area Plaintiff resided, worked, traveled, shopped or conducted business maintaining control.

33.         Defendant's Cabal that included operatives of their Program, used their influence and fake profiles of Plaintiff, was allowed by  many Police departments where Plaintiff resided, worked, traveled, shopped or conducted business, to place agents/officers involved in Defendant's  Cabal as Police officers in their departments that aided Defendants in their illegal control over Plaintiff, his rights, privacy,  and maintain defaming Plaintiff's character and professional reputation, ultimately for discrediting Plaintiff, maintaining Defendants original  main cover up that extend back to Lee Harvey Era.

34.         Defendant's malicious tactics in their actions of using some of their agents/officers to be placed as Police officers, allowed themselves to provide cover protection for their own Program operatives to operate in criminal acts of terrorism that included verbal intimidation threats of harm, assaults, battery, intimidation brandishing a firearm, destruction of property, staging vehicle and motorcycle accidents that also included certain Program operatives in truck driving with impunity against Plaintiff, Plaintiff's friends, Plaintiff's family and loved ones.  Defendant's Program operatives

were protected and covered in their criminal acts against Plaintiff, and prejudicial to Plaintiff's right to defend his person, family and loved ones.

35.         On or about July, 1985, Plaintiff became employed as a Correctional Officer, a Peace Officer position working custody at the Penitentiary Of New Mexico, Santa Fe, New Mexico, and also became a Santa Fe County Sheriff's Reserve Deputy, also worked as a Regular Deputy as needed. Upon Defendants aware during Plaintiff's application and training process, Defendants used their false profile of Plaintiff a Felon and other crimes to Both departments herein. Plaintiff was questioned by department investigators and Plaintiff was permitted to maintain his employment positions in a law enforcement capacity after further investigation.

36.         Defendants placed their agents/officers and Program members within the State of New Mexico Department of Corrections, Penitentiary Santa Fe, New Mexico, through influencing New Mexico Secretary of Corrections, Michael Franke, and Warden Sullivan. Defendants maintained their malicious and dangerous control over Plaintiff with Defendant's placed agents/officers working along with Plaintiff, including in supervisory over Plaintiff. Defendant's Program operatives were placed as staged inmates in various Cell Blocks, Dormitories, Food Service Kitchen, and other custody areas Plaintiff was assigned. In fact, many Program operatives were then, and currently, active U.S. Military and Veteran Special Operations.

37.         An inmate who had been part of the infamous 1980 Prison Riot, was near his Prison Number Discharge Date and leave for home, had provided Plaintiff some of pertinent information regarding some of the officers and inmates placed by Defendants. The inmates was murdered in his cell while resting asleep after his work duties. The inmate's murder occurred on the second tier of the cell block within approximately (12) twelve feet directly above the cell block officer's station, an open area enclosed with bars, not enclosed from sounds. The officer said, he never heard nor saw anything.

38.         Plaintiff already knew the officer was compromised and a part of Defendant's Program members operating in the Penitentiary. Plaintiff was a member of State Of New Mexico Department Of Corrections S.E.R.T., and Santa Fe County Sheriff's Department S.W.A.T.. Plaintiff was ordered to respond to secure the inmate's murder crime scene. During securing the crime scene, Plaintiff observed a tennis shoe print

tracking a stain of blood on the floor. Plaintiff followed the tennis shoe print that became faint to barely nothing as the tennis shoe print passed many cells on the same tier level as the murdered inmates cell. Plaintiff laid on the floor and completed following by the tennis shoe tread design to where entered a certain inmate's cell who was determined in fact one of two inmates who committed the murder.

39.       On or about September, 1987, Plaintiff had a meeting with the Major over all correctional officers and discussed the situation regarding some of the officers, inmates involved, and the increasing threat to Plaintiff's safety. The Major advised Plaintiff he had also became informed of a pending attack on Plaintiff's person, and reassigned Plaintiff to position as Control Center Officer at Penitentiary of New Mexico, South Facility, responsible for officers safety, inmate movement, and securing institution counts. On or about 1988, Defendant's Program operatives were involved in death of Plaintiff's brother in law in Santa Fe, New Mexico, near area of Guadeloupe Catholic Church.  Secretary of Corrections Michael Franke was killed, on or about 1989, in Salem, Oregon.

40.       On or about April, 1988, Plaintiff resigned his positions  because of Defendants malicious interference and dangerous actions maintaining their cover up regarding Plaintiff. Plaintiff relocated to State of Nevada Bureau of Prisons to begin employment at Southern Nevada Correctional Center, south of Las Vegas, Nevada.

41.       Defendants were aware of Plaintiffs process before accepted for employment as a Correctional Officer for State Of Nevada Bureau Of Prisons, and again used their influence with false criminal profiles as Defendants did in State of New Mexico, and maintained their malicious and dangerous control over Plaintiff's rights, employment, Privacy, and Defamation of Plaintiff's  character and professional reputation. Defendants again placed their agents/officers and Program members working with Plaintiff, and as inmates.

42.        Defendants  United States Department of Defense and Intelligence Agencies arranged for Plaintiff, and his In-service Training Class at Southern Nevada Correctional Center to access Defendants United States Air Force Test Range, near Las Vegas, Nevada. An Air Force Sergeant, and another official was Range Master overseeing Plaintiff's firearm instructor and class. Plaintiff's firearm instructor gave Plaintiff a .308 Rifle with (3) rounds of ammunition, and ordered Plaintiff  to shoot a target approximately 100s of yards down range that appeared almost a dot between the rifle line sights. The Air Force Range Master observed the target using binoculars. Plaintiff

10

was not given a scope. Plaintiff missed the target and the firearm instructor snatched the rifle from Plaintiff, and jabbed hitting Plaintiff with the rifle barrel end. Plaintiff looked back at the Air Force Range Master in Charge, who looked and said nothing. Firearm instructor again ordered Plaintiff to shoot the target. Plaintiff being angry at what occurred to him, then made his own focus adjustments for wind, distance, and directional movement of surrounding low brush around the dot target, and fired shooting the target twice with the last (2)two rounds of ammunition.

43.        Plaintiff began to endure many acts of malicious harassment from Defendant's United States Air Force Security Police placed at the Southern Nevada Correctional Center that included intentionally putting trash in rear truck bed of Plaintiff's vehicle instigating a confrontation with Plaintiff. Defendants were aware their acts against plaintiff was with impunity. Additionally, Defendants eventually caused Plaintiff's dismissal from his employment, even after Plaintiff received an evaluation of Standard. and Above Standard.  Plaintiff decided to leave law enforcement, and trained and obtained employment as a Driver for Greyhound Lines Inc.. Defendants again used their influence and forced their will of malicious control using same false criminal profiles of Plaintiff, and Defendants Program operatives again creating a dangerous environment for Plaintiff to work.

44.        On or about January, 1995, Plaintiff began processing for employment with City Of Albuquerque, Aviation Police Department (Airport Police Officer).  Plaintiff began employment on or about October, 1995. Defendants again used their influence and criminal profiles of Plaintiff, and placed their Agents/Officers from Quantico, Virginia, and Langley, Virginia, and others to work with Plaintiff as Police officers, and placed their Program operatives who aided creating a malicious and very dangerous working environment for Plaintiff.  Defendants and their operatives attempted (2) two incidents to cause demise of Plaintiff. One(1) incident involved by the hands of Sergeant Vigil, and Officer Vern Cobb, and incident (2) involved Officer Vern Cobb and a supposed criminal warrant suspect. Defendants malicious and dangerous actions, supported by United States Army Records Center, St Louis, Missouri, was a direct cause of Plaintiff's dismissal from City Of Albuquerque, Aviation Police Department.

45.        On or about 1996, Plaintiff filed a complaint with U.S. Equal Employment Opportunity Commission, whose investigator conducted a thorough competent investigation regarding Defendants profiles of Plaintiff used at City Of Albuquerque, Aviation Police Department that caused Plaintiff's dismissal, and determined all allegations were false and disingenuous actions. Plaintiff was given Right To File Suit.

46.        On or about 1997, Plaintiff filed Complaint Case No. CIV 97-0798 BB/RLP

In The United States District Court For The District Of New Mexico. Settlement was reach in that case and Plaintiff voluntarily resigned from City Of Albuquerque, Aviation Police Department on or about May, 1998.  Defendants in that case never ceased their malicious and dangerous acts further assisting United States Defendants herein.

47.        On or about July, 1998, Plaintiff replied to a Career ad in a Los Angeles, California news paper for Executive Protection Agent.  Plaintiff submitted his law enforcement training certificates including specialized training, and Law enforcement Letters of Commendation and Appreciation with his application at Brooks Protective Services for the position.

48.        On or about during last week of July, 1998, Plaintiff received a telephone call from Brooks Protective Services stating, Plaintiff was accepted for the Executive Protection Agent position, and further advised Plaintiff to report for duty at a hotel in Culver City, California  to assist United States Department Of State, Diplomatic Security Service Agents receive members of the Saudi Arabia Government Royal Family, from United States Department Of State, Diplomatic Security Service Agents, and Max Security Service assisting those agents arriving from New York, New York.

49.        Plaintiff was assigned to one younger sisters of now, Crown Prince of Saudi Arabia Government. Plaintiff was assigned to mother's room quarters of the Crown Prince for one(1) day, and then reassigned to same younger sister of the Crown Prince. Plaintiff's duties was to continue during the Royal Family's vacationing in Los Angeles, California area.  U.S. Diplomatic Security Service Agent, Pamela  Gary was present. Ron Pascal, and Charley Freeman was members of command post.

50.        Plaintiff began to know the United States Defendants herein were present and had again used same false criminal profiles of Plaintiff throughout the U.S. Diplomatic Security Service Secured area of the hotel. Plaintiff again began to endure malicious and very dangerous actions against his person from Defendant's Program operatives. Who also added a malicious false inference Plaintiff was a Muslim and terrorist

51.        On or about August, 1998, Plaintiff encountered members of the United States Of America, President  Clinton's  White House Military Staff,  part of President Clinton's U.S. Secret Service Preparation Detail. Plaintiff had already been requesting identification from anyone as part of his duty assignment and was not informed about President Clinton's U.S. Secret Service Detail would be directly crossing or involved in activities in Plaintiff's immediate assigned area of protection for the young Saudi Arabia

12

Government Royal Family Princess.

52.         Plaintiff encountered an unhappy member of the White House Military Staff
about Plaintiff viewing his identification.  Plaintiff was being relieved for a break when
a  member of President Clinton's Preparation Detail who appeared struggling with large
equipment in the stairwell area part of Plaintiff's assigned area and asked if Plaintiff
could assist him to the roof.  Plaintiff provided assistance in carrying the equipment to
the  roof and immediately left for his break. Plaintiff assistance handling  carrying the
equipment allowed Plaintiff's fingerprints to used against  him in a malicious and
dangerous nefarious scheme and actions by all United States Defendants complained
herein that began then and has remained currently.

53.         On or about August 20th, 1998, Plaintiff was asked by a servant of the younger
sister of the now Saudi Arabia Crown Prince, would Plaintiff be able to escort her to a
theater for her to view one of new movies. Plaintiff agreed and escorted her to the
theater after end of his duties at the protection detail.  The next day after when Plaintiff
returned to the protection detail,  Plaintiff was met by U.S. Diplomatic Security Service
Agent, Pamela Gary, outside of the command post, who during a brief conversation with
suspicion made inferences regarding two(2) U.S. Diplomatic Security Service Agents
were killed.


54.         On or about August 23rd, 1998 three(3) U.S. Diplomatic Security Service
Agents escorting the mother of now, Saudi Arabia Crown Prince, stopped his mother
directly in very close up to Plaintiff for approximately one (1) minute. The mother of the
Crown Prince looked at Plaintiff in a prolonged stare as though in a criminal lineup. The
Agents and the mother of the Crown Prince departed from plaintiff.


55.         On or about August 25th, 1998, Plaintiff was advised by an individual at the
protection detail with good knowledge, warning Second in Command of the Palace
Guard was arriving from Saudi Arabia to ensure the safety of the mother and sisters of
now Crown Prince, and other members of the, Saudi Arabia Royal Family, and Plaintiff is
suspected of being a terrorist threat against the Saudi Arabia Royal Family.


56.              On or about August 26th, 1998, Second Of Command of the Saudi Arabia
Palace Guard entered the floor corridor where Plaintiff was assigned and proceeded
toward Plaintiff, stopped and stared at Plaintiff, and left in direction of the command
post. Later that day, Plaintiff was advised by same individual, warning Plaintiff of
pending danger to Plaintiff's personal safety if he continue to work the detail. Plaintiff

13

remained determined to understand more details of himself being intentionally framed and placed in imminent danger, and all particulars and persons involved in the nefarious operation.

57.  On or about August 29th, 1998, Plaintiff did in fact became to know all pertinent details and particulars thereof, including the operation against Plaintiff, was a setup of Plaintiff be the "Decoy Fall Guy", cover-up secondary to the main operation. Plaintiff also became knowledge of many persons involved who aided in the main operation from Los Angeles, California area to Riyadh, Saudi Arabia, including a famous Hollywood actor celebrity, who himself was not involved in the main operation, only one of his family members connection to a person in the main operation. Plaintiff continue to maintain whereabouts of all information obtained herein, written in detail and signed, identify information of persons and details from Los Angeles, California to Riyadh, Saudi Arabia.

58.  On or about August, 30th, 1998, Plaintiff did not return to the command post and protection detail because of the Cabal of United States Defendants complained herein, several police and sheriff's deputies from various local area departments also working the detail through Defendant's private contractors, and Defendant's Program operatives, who were directly involved in nefarious scheme framing and defaming Plaintiff with knowingly false criminal profile allegations. Defendants added Plaintiff was a terrorist suspect who infiltrated the protection detail, a threat to Saudi Arabia Government Royal Family vacationing in Los Angeles, California, and threat to U.S. President Clinton and President Clinton's Preparation detail. In fact, Plaintiff was contacted by telephone from command post member, Charley Freeman inquiring if Plaintiff will return for his duties. Plaintiff advised he will not return and stated reason, wrongfully framed of false allegations endangering his safety. Charley Freeman then said, " We Are Just Trying To Protect The Royal Family ".

59.  On or about August 30th, 1998 evening, Plaintiff was contacted and informed the female person and main focus of the main operation had left the Saudi Arabia Government Royal Family, and had also taken very expense jewels from another younger sister of now Saudi Arabia Crown Prince, who Plaintiff was never assigned for protection duties. This particular of the main operation aided United States Defendants complained herein false criminal profile on Plaintiff previously involved in Grand Theft. Plaintiff was further advised the mother of now Crown Prince was furious and screaming for U.S. Federal Bureau Of Investigation to investigate the incidents.

60.         On or about August 31st, 1998, Plaintiff was contacted by command post member, Ron Pascal who advised Plaintiff, mother of now Crown Prince was giving gifts of Gucci Watches to all members of the protection detail and was seeking my presence. The Saudi Arabia Royal Family was ending their vacation in Los Angeles, California, and was departing later that evening to Orlando, Florida. Plaintiff advised Ron Pascal, he would receive any Gucci Watch gift from mother of now Crown Prince, when Plaintiff retrieve his paycheck when due at the office.

61.         United States Defendants including Intelligence Agencies, Defendants private contractors that included off duty, former and retired Police, sheriff's deputies, and corrections officers from various departments including State of California, and Defendant's  Program operatives who had already placed their operation against Plaintiff throughout the area surrounding Plaintiff's residence located at 8200 Bolsa Ave, Midway City, Orange County, California, Plaintiff's daughter and family in Garden Grove, California, and Plaintiff's daughter and family in Norwalk, California.

62.         United States Defendants and others alleged in Paragraph(61) began using same false criminal profiles alleged herein, with special attention to the Saudi Arabia Royal Family, and U.S. President Clinton's Preparation Detail involving President Clinton's White House Military Staff. Defendants and all others alleged engaged in malicious and dangerous acts against Plaintiff's right to freedom of movement and travel throughout every area he walked, running for exercise, or driving his vehicles. Defendants illegal acts included, verbal terroristic threats of personal harm, intentional destruction of property, and attacks on Plaintiff's person.

63.         Some Program operatives who are also members of law enforcement, used their Color Of Title to solicit aid from various law enforcement departments and officers on duty in acts of intentional malicious and dangerous stops on Plaintiff, when he ran for exercise and drove his vehicles for grocery shopping, seeking further employment, Try to visit friends and family or loved ones. Law enforcement involved used fake Reasonable Suspicion for the initial stop on Plaintiff, and never acquired Probable Cause to detain Plaintiff,  many instances for (45)forty-five minutes especially during night stops of malicious harassment.

64.         United States Defendants Program operatives in one(1) incident a Parole was staged on Plaintiff's running route in Westminster, California, who rode his bicycle. toward Plaintiff brandished a gun at Plaintiff, in act of intimidation. A separate incident when Plaintiff was driving his vehicle stopped awaiting a left turn signal, and a female

Plaintiff recognized as an off duty Orange County Sheriff's Deputy riding a bicycle, crossed in front of Plaintiff, pulled a pistol from her black Fannie Pack, and brandished the gun at Plaintiff in an intimidating manner. Plaintiff looked in his rear view mirror and observed another female who took her handcuffs waving them at Plaintiff.

65.        On or about October, 1998,  Plaintiff acquired employment position as Campus Safety Officer, at Mater Dei  High School located in Santa Ana, California. United States Defendants and Defendant's Program operatives placed their operation within and surrounding the school in their maintaining control over Plaintiff and his rights, privacy, personal safety, and continuous defamation of Plaintiff using same false criminal profiles Defendants created of Plaintiff since beginning in early 1970s and additional false criminal profiles created over years by Defendants during maintaining Defendants determination of cover-up and control over Plaintiff.

66.         Defendant's placed two(2) Program operatives working with Plaintiff from Los Angeles, and Santa Ana area who had gang connections in those areas. The Program operatives working also as Campus Safety Officers with Plaintiff, engaged in acts more closely with Defendants Department Of Defense, U.S. Military and Intelligence Agencies. The same described Program operatives were directly involved in creating a hostile and dangerous environment for Plaintiff at the high school, and assisted in intimidation threats of personal harm and staged attacks using gang member connections also associated with Program.

67.        Plaintiff's shift was 3pm to 11pm., and Program  operatives used night hours staging dangerous attacks attempted on Plaintiff's personal safety.  Defendants knew Plaintiff had a firearm and Plaintiff's former training and experience when Defendants used their Program operatives that involved gang members, parolees, and other criminals, staging attacks on Plaintiff's personal safety, and also knew Plaintiff was unarmed on School Campus.

68.         Program operatives importantly use distraction, appearance of a coincidence that is actually staged, vulnerable traits of a person, and other vulnerabilities in a person's lifestyle including employment, medical, enjoyment of life, places attend, routes and routine, when a person is targeted for creating that person's demise and elimination.  Political target elimination more often require two(2) involved when (1)one operative depending on circumstances may have high percentage of difficulty to be effective eliminating the target. The second operative is always in a position of 100% effectiveness without difficulty and ensure elimination of the target, and operative (1),

usually not knowing about Second operative, is usually also unknowingly pre set up for cover-up of the operation.

69.        Two(2) dangerous incidents were instigated inside high school grounds involving spanish gang members who drove onto parking lot inside of school grounds brandishing a pistol firearm staring at Plaintiff. Officer alleged herein working with Plaintiff asked Plaintiff not to call police that he will handle the situation, exited Plaintiff's vehicle and proceeded to the suspects vehicle. The officer talked to the suspects who appeared to know the officer, then placed the gun in his pants and drove off of the school grounds.

70.        Defendant's Program operatives used different types of aircraft , including some military aircraft in their assured control over Plaintiff. One(1) type of air craft was a NOTAR Helicopter a (No Tail Rotor ) dark blue appearing black color at night, with no tail numbers, or identifying  markings. The helicopter including a single engine, and a twin engine, both fixed wing airplanes, and U.S. Military type aircraft were also used often in a flight pattern providing Defendants and their Program operatives assured control over Plaintiff,  for monitoring and eavesdropping Plaintiff, and tracking Plaintiffs movements the moment he leave his house, and aided in arranged and staged malicious and dangerous attacks on Plaintiff as he tried to exercise his Civil liberties including enjoyment of life freely. Often Defendants and Program operatives already knew where Plaintiff was going because of eavesdropping his home telephone, cellular phone and his Seiko Message Watch he had.

On or about May, 1999, Plaintiff was asked to resign his position as Campus Safety Officer at Mater Dei High School. The administrator advised Plaintiff, their request was for the safety of the students and staff, because of the continuous dangerous environment created since beginning Plaintiff's employment at the high school. A group of Program operatives staged around Plaintiff's house, merged on Plaintiff as he drove to meet his attorney friend whose office was located near Los Angeles International Airport, to complain about all of Defendant's actions. Program operatives forced a wreck of Plaintiffs Mercedes Benz, trying to Prevent the meeting. Defendants learned eavesdropping Plaintiff's telephone.

71.        On or about October, 1999, United States Defendants, and Defendants Program operatives had caused plaintiff loss of his house, two(2) Mercedes Benz automobiles and a Classic Mustang, all new furnishings purchased for every room in the house,  bank finances, his employment and ability to gain employment, friends and family because of use of Defendants Color Of Title in a Rogue manner intimidating and

17

threatening, demanding no contact, or monitored contact with Plaintiff, overseen by
Defendants and their Program operatives. These malicious tactics remain currently.

72.         On or about November, 1999, Plaintiff filed an Original Complaint for
Violation of his Constitutional Rights, and for Defamation, in The United States District
Court Central District Of California, Southern Division, Santa Ana. Plaintiff was granted
leave to amend his Complaint by The Honorable Gary L. Taylor, U.S. District Judge, Room
10D, filed on or about 2000. Tony R. Whittaker vs. Brooks Protective Services et al,
Case No. SACV 99-01452 GLT (EEx).

73.         Plaintiff prevailed in several legal decisions involved in the case described in
Paragraph(72), however, Honorable Gary L. Taylor , U.S. District Judge did order Plaintiff
to "Disclose All Including Specifics, And Particulars Of Those Specifics". Honorable Judge,
Taylor, had said to Plaintiff previously during hearing part of record transcript when
granting Plaintiff leave to amend his complaint, what Plaintiff is alleging is not suppose
to be happening. Immediately after Honorable Judge Taylor's Order To Disclose All,
Counsel for U.S. Defendants, Assistant U.S. Attorney, John E. Nordin II, Assistant Chief
Civil Division, gave Plaintiff a letter stating, " I Have A Low Clearance, Anything You Say
To Me Will Be At Your Own Peril "! Defendants had alleged Plaintiff was delusional, yet
concerned about what Plaintiff can speak as to facts, and prove his allegations.

74.         Plaintiff felt intimidated by Assistant U. S. Attorney, John E. Nordin II, letter
because in fact, there is information that could be deemed some level of Classified.
Plaintiff felt he risked pleasing all Defendants by losing his freedom criminally disclosing
all, just to gain rightful Redress and rightful freedom from Defendants. Plaintiff's case
was Dismissed for Failure To Prosecute by Honorable Gary L. Taylor, U.S. District Judge,
on or about 2002. On or about 2002, Plaintiff filed an Appeal in The United States Court
Of Appeals For The Ninth Circuit, Tony R. Whittaker vs Brooks Protective Services, et
al Case No. 04-56860. Assistant U.S. Attorney, John E. Nordin II during hearing stated,
"The Federal Defendants said they had no interest in Plaintiff, and did not know he
exist", and asked that Plaintiff be declared a Vexatious Litigant.

75.         Honorable Gary L. Taylor, U.S. District Judge In Chambers Decision regarding
Plaintiff's Request For Temporary Restraining Order against Defendants was, " Plaintiff
Can Report All Allegations To The Appropriate Law Enforcement Agency"! Plaintiff did in
fact follow Honorable Judge Taylor's decision, and traveled to San Diego, California to
the Federal Bureau of Investigation Office. Plaintiff at night hours and spoke on the
telephone to a Duty Agent regarding the allegations. The Duty Agent chuckled referring

18

Plaintiff to U.S. Marshall's Office, who advised their office could do nothing. Plaintiff
traveled to Anaheim, California area and again contacted a Duty Agent at that location
and the female Duty Agent also chuckled at Plaintiff during the telephone call.

76.        Honorable Gary L. Taylor U.S. District Judge Order To Disclose All Including
specifics And Particulars Of Those Specifics, and further, Plaintiff Can Report Criminal
Acts To An Appropriate Law Enforcement Agency, Plaintiff realize no criminal or
terrorist organizations, or operations in a criminal or terrorist manner in the United
States, against citizens of the United States, as Plaintiff alleged then and now, has no
right to secrecy, nor enjoy right of secrecy. Plaintiff has separated particulars involved in
Defendant's actions against him only because of also good men and women who do not
operate Rogue, but Rightful, in the interest of National Security, requiring secrecy.

77.        On or about September, 2003, Plaintiff returned to Chicago, Illinois, and on
or about June, 2004, Plaintiff corrected his identity from Tony R. Whittaker, to Tony R.
Little. Plaintiff initially corrected his identity in the United States Social Security
Administration who held two(2) identities on Plaintiff for Defendants as alleged in
Paragraphs (9) thru (14), and then after, corrected in United States Department of The
Treasury, Internal Revenue Service, and state and local governmental entities.

78.        United States Defendants created a profile against Plaintiff correcting his
identity information alleging Plaintiff was using Tony R. Little, to hide his criminal life,
because he had a warrant, and that Plaintiff was trying to hide his U.S. Military
connection during Vietnam era, and still belong to the U.S. Military. All false criminal,
Terrorist, and false profiles added in this Paragraph were used continuously, and remain
currently. On or about October, 2005 Plaintiff relocated back to State of New Mexico.

79.        On or about 2006, United States Court Of Appeals For The Ninth Circuit
returned the court's decision confirming Honorable Gary L. Taylor United States District
Judge decisions and orders regarding Case No. SACV 99-01452 GLT (EEx).

80.        Plaintiff obtained employment in construction in the City of Tucumcari, New
Mexico. United States Defendants, Military and Intelligence Agencies, and Program
operatives continued their malicious and dangerous campaign of illegal actions against
Plaintiff rights regarding his employment using same aforementioned false criminal
profiles defaming Plaintiff, and placing Program operatives who aided Defendants in

19

wrongful controversy against Plaintiff, harassment and instigated conflicts and confrontations, and staged attacks of personal harm to Plaintiff.

81.         Defendants used their false criminal profiles of Plaintiff and solicited assistance from state, county, and municipal law enforcement as part of their usual operation of control over Plaintiff, who with officers placed in departments who are loyal to Defendants operation against Plaintiff,  provided cover for Defendant's illegal Program operatives and their illegal actions against Plaintiff with impunity.

82.         Early one morning, Plaintiff left his residence in Tucumcari, New Mexico, driving to his bank approximately one( 1) hour and half driving time East on Interstate 40  to Amarillo, Texas. Defendants only had a skeleton crew of a few operatives aided by a single engine fixed wing airplane maintaining monitoring and control over Plaintiff's movements.  Plaintiff approached Adrian, Texas near Interstate 40 Mile Post Marker (22), and was wrongfully stopped by a Texas Department of Public Safety Trooper, as the aforementioned airplane circled above. The trooper requested to search Plaintiff's vehicle for child pornography, alcohol, and drugs. Additionally, the trooper also was on his  cellular phone with City of Albuquerque, Aviation Police Supervisor who also told the trooper Plaintiff had sued the department. Plaintiff stopped was again pretense.

83.         On or about August, 2009 Defendant's  Program operatives used two(2) women in staging an accident to cause Plaintiff to rear-end their vehicle with his motorcycle. Plaintiff avoided the accident and the women began intentionally swerving their vehicle side to side laughing in their fear view mirror at Plaintiff. After three(3) unsuccessful attempts on Plaintiff, the women drove onto Interstate 40 Eastbound. Plaintiff called New Mexico State Police, who contacted a Port Of Entry Department of Public Safety Officer in the area who intercepted the women involved.

84.         On or about November,  2009,  Plaintiff relocated to City of Hannibal, Missouri. On or about 2011, Plaintiff was given tests during a day for Contractor License Electrical, and Contractor License Plumber, for City of Hannibal, Ralls, and Marion Counties. Although Defendants tried to also place Program operatives against Plaintiff in Hannibal, Defendants and their Program operatives were unable to succeed in their usual malicious and dangerous operations against Plaintiff in Hannibal, Missouri.

85.        On or about July, 2011 Plaintiff relocated to the St Louis Metropolitan, Missouri. Defendants again placed Program operatives on Plaintiff maintaining their control over Plaintiff, Plaintiff's rights and defame Plaintiff to discredit him because he is knowledgeable regarding much information regarding Defendants and Program operatives in past and present years. Plaintiff's business remained in City of Hannibal.

86.        On or about July, 2011 Defendants Program operatives staged two(2) women in a false allegation against Plaintiff at a former Gas Station regarding theft of their money placed in the window tray and duty clerk, that was located cornering Kings Highway Blvd., and Martin Luther King Blvd., St Louis, Missouri. Plaintiff was in line behind the women, paid for his gas and cigarettes, received his change from the clerk, pumped his gas and left to home. Plaintiff called St Louis Police immediately upon arriving home about the incident. While on Phone with dispatcher giving her his address, the dispatcher said Police are outside and to talk to them. Plaintiff opened the door facing approximately five(5) guns in front, and same amount to his right side at end of the building. Plaintiff was taken back to the gas station where the clerk verified Plaintiff's account of the incident. Plaintiff was driven back home. Plaintiff went to the office to explain the events involving Police to the manager and observed an officer at the counter defaming Plaintiff's character to the manager, who immediately told Plaintiff he would have to move from his residence.

87.        On or about July 19th, 2011, Plaintiff relocated to Bridgeton, Missouri, after Defendants malicious action alleged in Paragraph(86).  Defendants again placed their Program operatives maintaining control over Plaintiff, Plaintiff's rights and defame Plaintiff using false criminal and Military profiles created of Plaintiff. On or about August, 2014 Defendants Program operatives again used a women driving in front of Plaintiff's motorcycle, who while being directed by the single engine fixed wing airplane directly about, and viewing Plaintiff in her rear view mirror on her cellphone, attempted to cause Plaintiff an accident by hitting the rear of her vehicle and become airborne from the motorcycle causing himself serious injury or death in appearance by his own demise, as was same purpose in New Mexico. Recognizing what was about to occur, Plaintiff slowed giving more distance, and the woman then slammed her brakes for no real reason of traffic hazard because only Plaintiff, the woman, and the airplane above. Plaintiff was forced to lay down his motorcycle causing injury to his right leg.

88.        On or about January, 2015, Plaintiff's  daughter,  Victoria Lynn Whittaker, who Defendants and their Program operatives had used in controlled and monitored

conversations with Plaintiff her father, was killed in Los Angeles, California, and covered up to appear a suicide by her own demise. Plaintiff had talked to his daughter Victoria, only minutes before her death. On or about February, 2015, Plaintiff was driving to Los Angeles, California to discuss his daughter, Victoria's death with investigating detectives. Defendants were aware because of continuous eavesdropping Plaintiff's cellular phone as apart their control over Plaintiff and his rights. Defendants Program operatives aided by their aircraft had a waiting Joplin, Missouri Police Officer stop Plaintiff at approximately 2: 47 am, after following for approximately (7) miles, who gave reason, Plaintiff's new license plate was reflective. The officer then ordered Plaintiff from his vehicle to search for drugs with a K-9 Dog brought by another officer, and a Sheriff's Deputy who stood with Plaintiff during the search. Plaintiff was detained for approximately (49) minutes in the cold.  Plaintiff was again detained under pretense.

89.         On or about between April, 2017 and October, 2018, Defendants provided a Juvenile Officer for The Circuit Court Of The City Of St Louis State Of Missouri Family Court-Juvenile Division, who was conducting a character investigation to determine Plaintiff's suitability to gain custody of his son. The Juvenile Officer questioned Plaintiff regarding papers he obtained from Defendant United States Department of Defense, U.S. Army Records Center, and City of Chicago, Illinois. Plaintiff advised the Juvenile Officer, all information regarding, the officer possess is not worthy of the paper written on, especially from U. S. Military Records, and Chicago, Illinois. Plaintiff further advised possession of true documents from a 1996 federal investigation submitted as United States District Court Exhibits, that will prove contradictory to false papers and information given the Juvenile Officer. The Juvenile Officer then said, he will not submit the papers against Plaintiff.  Plaintiff appreciated the Juvenile Officer's integrity conducting a competent truthful investigation.

90.         On or about March, 2018,  Plaintiff obtained residence at 1370 Ferguson Ave., Pagedale, Missouri.  Defendants and Program operatives as usual occurrence throughout Plaintiff's life alleged herein complaint, used their created false criminal profiles of Plaintiff, that allowed Defendants to place operatives throughout Plaintiff's surroundings, learned routes to his work areas, shopping, to his son's daycare, business clients. Defendants and Program operatives eavesdropped Plaintiff's phones and in his home, and used for determining all of Plaintiff's contacts, interactions in his home, and when he leave his home. Defendants again used all illegally gathered information in their monitor and control over Plaintiff  in continuous interference of Plaintiff's rights, defame Plaintiff, and stage an attack on Plaintiff's person using their criminals in the Program to appear by Plaintiff's own demise.

22

91.         Defendants continuously interfere with Plaintiff's work and business clients, new customers, Plaintiff's workers and subcontractors involved in construction projects. Defendants influence and interference caused loss of funds and hardship on Plaintiff's business in Defendants malicious defamation campaign discrediting Plaintiff, and his ability to work, and earnings. Defendants use their influence determining how much Plaintiff is to earn. Plaintiff's  current business contracts has and continues to suffer directly because of Defendants continuous malicious control and influence in Plaintiff's recent contracts since on or about March, 2021, and currently.

## COUNT I
## VIOLATION OF FIRST AMENDMEMT
## AGAINST UNITED STATES DEPARTMENT OF DEFENSE.
## UNITED STATES DEPARTMENT OF STATE, DIPLOMATIC
## SECURITY SERVICE, UNITED STATES DEPARTMENT OF
## THE TREASURY, SECRET SERVICE AGENCY, UNITED STATES
## DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION
## UNITED STATES CENTRAL INTELLIGENCE AGENCY

92.         Plaintiff incorporate all preceding paragraphs alleged herein.
United States Defendants had a duty with integrity to competently investigate Plaintiff's character and any and all criminal and terrorist allegations as part of his security clearance entering U.S. Military Service, law enforcement, or even private contractors Working assisting Defendants U.S. Agents/officers.

93.         United States Defendants instead formed a Cabal against Plaintiff, combined with members of various U.S. Departments and Agencies of Defendants because of as alleged in Paragraphs (9), and (12). United States Defendants, placed a Program operation against Plaintiff and his First Amendment Rights to Freedom of Speech, and Freedom of Assembly, and Redress.

94.         United States Defendants Program operation against Plaintiff was, and remain the sole method used in maintaining a blanket of control over plaintiff, through

stalking Plaintiff and monitoring who he talk, and who talk to Plaintiff, in same manner as revolving tap eavesdropping Plaintiff's telephone. Defendants used their color of title, and false criminal and terrorist profiles of Plaintiff, in intimidation of Plaintiff's friends, children, business contacts and clients, suppressing freedom of speech and assembly without Defendants oversight and control, and further suppression of Plaintiff's rights.

95.         United States Defendants and their Program operation against Plaintiff, caused wrongful  controversy and conflict that ensued between Plaintiff, and his daughters in California. Defendants intentionally placed false information in Truth Finder Internet Search Site alleging Plaintiff had a  criminal conviction in Los Angeles County, California for a Cannabis Case, and stated separately, Plaintiff was under a Government Watch List.  Defendants actions are specifically designed in isolating a target, creating conflict separating a target from family, friends, other loved ones as did Plaintiff. In addition, some of Plaintiff's  friends, contacts, his daughter,  and brother-n-law in New Mexico,  and former superior who had direct knowledge of Defendants operation at State of New Mexico Penitentiary in Santa Fe, lost their lives.

96.         United States Defendant United States Department of Defense has no legal Constitutional Authority engaging in a Police Action on Plaintiff , a United States Citizen, in a civilian society. Defendant United States Department of Defense used their Military Police/C.I.D. using false military profiles of Plaintiff that aided in soliciting assistance from various state, county, and municipal  law enforcement departments and specialized units of those departments in intentional illegal control of Plaintiffs freedom of speech and assembly. In addition, Defendants malicious and dangerous Program Operatives were given unfettered access to Plaintiff's daily routine and communications, and was permitted to engage in criminal stalking of Plaintiff, aggressive malicious acts of intentional staging and creating vehicle accidents causing harm to Plaintiff, and destruction of his property, malicious harassment of Plaintiff's employment and business, and blatant assaults and attacks on Plaintiff's person.  Program operatives were given cover, and Plaintiff's complaints were overlooked and instead Plaintiff scrutinized. Defendants deprived Plaintiff of all of Rights except with their scrutiny.

97.         Defendant Department Of Defense Intelligence Agencies and Military Police/C.I.D.  intentionally denied Plaintiff right to redress directly within the U.S. Army at Fort Leonard Wood, Missouri because of as Plaintiff alleged in Paragraphs (9) thru (26). Instead, Defendants  created false criminal profiles against Plaintiff to maintain their cover up, and fake profiles the U.S. Military maintains control over Plaintiff's person and rights. In addition, Defendants maintaining their own U.S. Military Records

24

of Plaintiff also involve discharge information at the U.S. Army Records Center, Defendants use against Plaintiff. The records reveal Defendants actions and cover-up alleged herein, and some of individuals involved. Defendants tried to impede Plaintiff when he corrected his identity to his original birth information in his own best interest.

98.          United States Defendants intentionally denied Plaintiff ability to complain and seek redress directly with Defendants regarding their illegal malicious and dangerous actions alleging false terrorist and Grand Theft allegations regarding Plaintiff to the Saudi Arabia Government Royal Family, as alleged in Paragraphs (47) thru (60). On or about March, 2020,  Plaintiff contacted the office of United States Director Of National Intelligence and filled a complaint form and was denied ability to submit the complaint forms. Plaintiff was impeded when seeking Redress through U.S. Department of State.

99.          As a direct and proximate cause of all Defendants, and Defendant's Program Operatives illegal, malicious and dangerous actions intentionally committed against Plaintiffs Rights alleged herein, Plaintiff loss his childhood teenage years and ability of achievements during and after high school, loss of his Guaranteed Enlistment Contract, his military pay and rank after on or about March, 1974, loss of earnings and house in Chicago, Illinois, loss of employment due to  Defendants illegal operation against Plaintiff at State of New Mexico Department Of Corrections, and State of Nevada Bureau of Prisons, City of Albuquerque Aviation Police Department, United States Diplomatic Security Service, and Brooks Protective Services/ Max Security Services Protection Detail, Mater Dei High School, loss of his house and new furnishings in Midway City, California, (2) two Mercedes Benz  automobiles, a 1970 Classic Mustang, damage to his Harley Davidson Motorcycle, loss of funds in his business and financial institutions that

Wherefore, Plaintiff request compensatory and punitive damages against all United States Defendants together with all costs.

## COUNT I I
## VIOLATION OF FOURTH AMENDMENT
## AGAINST UNITED STATES DEPARTMENT OF DEFENSE
## UNITED STATES DEPARTMENT OF STATE, DIPLOMATIC
## SECURITY SERVICE, UNITED STATES DEPARTMENT OF THE

## TREASURY, SECRET SERVICE AGENCY, UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION, UNITED STATES CENTRAL INTELLIGENCE AGENCY

100.        Plaintiff incorporate all preceding paragraphs alleged herein.
Plaintiff had, and have a right to be secure in his person, his house, his paper, and effects against unreasonable searches by all United States Defendants and Defendant's Program operatives, and any state, county, or municipal law enforcement departments solicited engaging in actions described herein. Defendants and their Program operatives used their technology and ability willfully violating Plaintiff's Fourth Amendment Rights even prior to the Patriot Act, and never truly nor truthfully acquired any warrant under conditions required by law without being subject to perjury. In addition, there is no such Probable Cause that extend throughout a citizens life, especially for the prior (40 ) forty or more years and currently.

101.        Defendants illegal Program operation placed on Plaintiff, used in blanket control over Plaintiff's rights, privacy, and defaming Plaintiff, depend upon Defendants ability eavesdropping Plaintiff's telephones, that provided information of all of Plaintiff's contacts, communications including text and chat, work related business, his routine, and communication with his family, friends and relationships. Part of Defendant's Program method of operation extend many years as described in previous Paragraphs (9) thru (11) had, and have operatives loyal to the Cabal and Program, who have been placed working in many businesses and institutions who aid Defendants actions against a person/citizen targeted as did, and continues against Plaintiff and became very easy without necessary legal Process to operate against Plaintiff's Fourth Amendment Rights.

102.        Defendants and Defendant's Program operatives used their ability and insider support in learning about Plaintiff's employment opportunities, banking institutions information, telephone institution information including all communications and text, who Plaintiff was interested in internet dating sites in America and abroad,, then engaged in Cyber Attacks defaming Plaintiff character and professional reputation using false criminal profiles against Plaintiff, and intentionally sabotaged his right to pursuit of happiness. Defendants learned when, where, and the attorney Plaintiff was meeting to complain about Defendants, and Defendant's Program operatives illegal actions against Plaintiff, and staged attacks on Plaintiff when he left his home driving to the meeting in retaliation. In addition, Defendants illegal and malicious eavesdropping assured there was no attorney client privilege any time. Defendants contacted attorneys they learned Plaintiff was telephoning and then immediately used their color of title and false

26

information regarding plaintiff to impede his ability to counsel. Plaintiff realizing
Defendants illegal actions against him, and  contacted (2) two different attorneys he
knew as social acquaintances in Los Angeles, California, who cautiously advised Plaintiff
of three of the Defendants involved in the illegal acts against his Rights.

103.        As a direct and proximate cause of Defendants, and Defendant's Program
operatives illegal malicious and dangerous actions intentionally committed against
Plaintiff's Fourth Amendment Rights, Privacy, his right to pursuit of happiness and
enjoyment of life, and interfering in his employment, business clients and contracts,
was without even Reasonable Suspicion, to even begin amounting to Defendants having
Probable Cause to obtain any legal search warrant against Plaintiff,  maintained for a
period amounting to approximately (40) or more continuous years terrorizing Plaintiff,
intentional deprivation of his Rights, and Defaming Plaintiff to maintain their cover-ups
by discrediting Plaintiff's character and professional reputation, and alleging Plaintiff
delusional. Plaintiff incorporate Paragraph (99) herein regarding his damages.

Wherefore Plaintiff requests compensatory and punitive damages against all United States
Defendants together with all costs.

## COUNT III
## VIOLATION OF SIXTH AMENDMENT RIGHTS
## AGAINST UNITED STATES DEPARTMENT OF DEFENSE
## UNITED STATES DEPARTMENT OF STATE, DIPLOMATIC
## SECURITY SERVICE, UNITED STATES DEPARTMENT OF THE
## TREASURY,SECRET SERVICE AGENCY, UNITED STATES
## DEPARTMENT OF JUSTICE, BUREAU OF
## INVESTIGATION, UNITED STATES CENTRAL INTELLIGENCE
## AGENCY

104.        Defendants United States Department Of State, Diplomatic Security Service,
United States Department Of Justice, Federal Bureau Of Investigation, and United States
Department Of The Treasury, Secret Service Agency, had a duty to truthfully and
competently investigate allegations of Plaintiff being involved in theft of jewels from a
young Princess, and terrorist threat of harm to her mother, who had diplomatic status
with her son, now Crown Prince, of Saudi Arabia Government Royal Family. In addition,

27

United States Secret Service, although whose preparation detail for now former United States President Clinton crossed paths through Plaintiff's assigned areas of responsibility, United States Secret Service also protect foreign diplomats, and could have investigated All allegations including the wrongful incident when plaintiff was framed also by White House Military Staff Members.

105.        United States Defendants aforementioned in Paragraph (104), refused and denied Plaintiff his right, if accused of a crime especially of allegations described herein, Plaintiff's ability to confront his accusers and his right to present a defense. United States Defendants knew of their main operation, and intentionally framed Plaintiff as a cover-up operation. Defendants convened a hearing against Plaintiff amongst themselves as prosecutors and judges in a Cabal against Plaintiff, and allowed the Saudi Arabia Government Royal Family to maintain allegations against Plaintiff, alleging he committed Grand Theft of Jewels from one of younger sisters of now Saudi Arabia Crown Prince, and a Terror Threat on the mother of the now Saudi Arabia Crown Prince.

106.        United States Defendants additionally, used the wrongful incident alleged herein in bolstering U.S. Military's false position of rightful control over Plaintiff, and original cover-ups alleged in Paragraphs (9) thru (26) herein.  United States Defendants Illegal, malicious and dangerous intentional actions taken collectively against Plaintiff, Placed Plaintiff in danger of imminent personal harm if he travel abroad away from the United States mainland where the Saudi Arabia Government Royal Family has an Embassy,  or friend loyal to Saudi Arabia. Defendants false allegations remain currently.

107.        As a direct and proximate cause of Defendants and Defendant's Program operatives illegal, malicious and dangerous actions intentionally committed against Plaintiff's Sixth Amendment Rights,  Plaintiff incorporate Paragraph (99) regarding his Damages.

Wherefore,  Plaintiff request compensatory and punitive damages against all  United States Defendants together with all costs.

## COUNT IV
## VIOLATION OF FOURTEENTH AMENDMEMT

## AGAINST UNITED STATES DEPARTMENT OF DEFENSE, UNITED STTATES DEPARTMENT OF STATE, DIPLOMATIC SECURITY SERVICE, UNITED STATES DEPARTMENT OF THE TREASURY, SECRET SERVICE AGENCY, UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION, UNITED STATES CENTRAL INTELLIGENCE AGENCY

108.        Plaintiff incorporate all preceding Paragraphs alleged herein. Plaintiff, a citizen of the United States by birth had, and have every right to Equal Protection described in The Fourteenth Amendment of the United States Constitution. United States Defendants predetermined Plaintiff's Constitutional Rights as a result of Plaintiff's birth as one of the older children, as alleged in Paragraphs (9), thru (12).

109.        United States Defendants utilized their influence in Plaintiff's life aiding his abilities as a teenager arranging a second identity of Plaintiff, used part an experimental process. Because of Plaintiff's very high intelligence abilities and maturity for his age, influence of United States Defendants, and cooperation of state, county, and municipal involvement, Plaintiff was able to work performing duties and assignments in a law enforcement and security capacity as alleged in Paragraphs (13 thru (29).

110.        As a direct result of Plaintiff's injuries, and Romelle Taylor's father, Cook County Sheriff's Deputy Frank Taylor Sr. uncovering some facts regarding Plaintiff, as alleged in preceding Paragraph (109), United States Defendants immediately began an illegal campaign of strict control over Plaintiff's life and rights, his privacy, and used their Program operatives in creating lifestyle scenarios used in discrediting Plaintiff, and arranging his demise. Defendant's Program operatives were given complete authority and cover of their acts, approved by United States Defendants, who also used false criminal profiles soliciting aid from state, county, and municipal law enforcement departments.

111.        United States Defendants used their influence and fake criminal profiles of Plaintiff, and were also able to place their Program operatives loyal to Defendants within state, county, municipal law enforcement departments. Defendants operatives placed in law enforcement departments, aided use of fake criminal profiles against

29

Plaintiff, and provided cover for United States Defendants and their Program operatives illegal, malicious, dangerous and intentional control and deprivation of Plaintiff's Constitutional Rights, his privacy, acts of continuous harassment of Plaintiff in further attempts to entrap him, and or frame Plaintiff, and attacks on Plaintiff's person, family, friends and loved ones, employment, his construction business, financial institutions and wherever Plaintiff had accounts, his property, cyber attacks on Plaintiff's right to seek his pursuit of happiness within United States or abroad, Plaintiff's right to travel about freely without unwarranted harassment and staged attacks on him, and provided cover for Defendants Program operatives when Plaintiff complained about heir acts.

112.        As a direct and proximate result of Defendants and Defendant's Program operatives illegal, malicious, and dangerous actions intentionally committed against Plaintiff's Fourteenth Amendment Rights. Plaintiff incorporate Paragraph (99) regarding his damages.

Wherefore, Plaintiff request compensatory and punitive damages against all United States Defendants together with all costs.

## COUNT V
## DEFAMATION
## AGAINST UNITED STATES DEPARTMENT OF DEFENSE
## UNITED STATES DEPARTMENT OF STATE, DIPLOMATIC
## SECURITY SERVICE, UNITED STATES DEPARTMENT OF
## THE TREASURY, SECRET SERVICE AGENCY, UNITED
## STATES DEPARTMENT, DEPARTMENT OF JUSTICE,
## UNITED STATES CENTRAL INTELLIGENCE AGENCY

113.        Plaintiff incorporate all preceding Paragraphs alleged herein. United States Defendants arranged Plaintiff's life and rights as alleged in preceding Paragraphs (9) thru (12). Defendants began a campaign against Plaintiff, and placed Program  operatives whose method of operation targeting Plaintiff, or any citizen when placed on them like Plaintiff, was, and remain currently, create " Controversy, Chaos, Confusion, Conflict " in the persons life, liberties, privacy, and person, in ultimate arranging a persons demise and illumination, as Plaintiff alleged in preceding Paragraphs (9) thru (12).

114.        Defendants illegal actions when they created and used fake/false criminal
profiles of Plaintiff, was a direct result as alleged in preceding Paragraphs (9) thru (29).
In addition, Defendants used same false criminal profiles created by Defendants during
Plaintiffs U.S. Military Service, deprived Plaintiff of his pay for (6) six months, loss of rank
after Basic and Advance Training, and his Guaranteed Enlistment Contract.

115.        Defendants maintained, and continue to maintain their false created criminal
profiles Plaintiff,  and Defendants cover-ups within Defendants U.S. Army Records
Center regarding Plaintiff.  Defendants used their false created criminal profiles of
Plaintiff, and a fake U.S. Military Right of control over Plaintiff, throughout Plaintiff's life,
in every state, county, and City Plaintiff would reside, gain employment, conduct
business, travel, or enjoyment of his right and liberties, and solicited aid from law
enforcement departments assistance in Defendants, and Defendant's Program
operatives stalking and terrorizing Plaintiff, deprivation of his rights, destruction of his
property and attacks on his person, family, friends and loved ones.

116.        Defendants engaged in Cyber Attacks and used false criminal profiles in
malicious influence of intimidation on women, defaming Plaintiff, and sabotage his
ability to seek his pursuit of happiness in the United States, and abroad. Additionall,
Defendants created a false criminal profile alleging Plaintiff have a criminal case in Los
Angeles County for Cannabis violation, and conviction in 1984, provided to Truthfinder
Internet search Site, and referred to Plaintiff's daughters in Los Angeles, California area.

117.        Defendants used false criminal profiles of Plaintiff, and defamed him at his
employment at State Of New Mexico Department Of Corrections, Santa Fe County
Sheriff's Department, State Of Nevada Bureau Of Prisons, Greyhound Lines Inc., City Of
Albuquerque Aviation Police Department, State of New Mexico Law Enforcement
Academy, Brooks Protective Services, Max Security Service, U.S. Department Of State
Diplomatic Security Service Agents Protection Detail.

31

118.        Defendants lodged false defamatory dangerous allegations Plaintiff is a
Terrorist Threat, and Grand Theft to the Saudi Arabia Government Royal Family, and
that remain currently, and additionally, false defamatory allegations Plaintiff is a
terrorist threat to United States President Clinton's Preparation Detail of White House
Military Staff Members, whose malicious false statements supported Defendant's
Cabal's second operation that framed Plaintiff, and covered Cabal's main operation.

119.        Defendants knew their profiles of Plaintiff were false, and created over many
years in their malicious and dangerous control over Plaintiff, for Defendant's cover-ups.
First Reason, as alleged in preceding Paragraphs (9) thru (12), Second Reason, as alleged
in preceding Paragraphs (13) thru (29). Defendant's Cabal's, Third Reason when framed
Plaintiff to the Saudi Arabia Government Royal Family was seal Plaintiff's demise at the
hands of the vacationing Saudi Arabia Government Royal Family who in fact had
"Diplomatic Status And Immunity". That part of Defendant's, and Defendant's Program
operatives malicious and dangerous Half Baked Scheme fell short of success, only
because Plaintiff was advised warning not to return due to being framed, and refused to
return to the Protection Detail Command Post for further duty assignment.

120.        As a direct and proximate result of Defendants and Defendant's Program
operatives illegal malicious and dangerous actions intentionally committed that
Defamed Plaintiff, destroyed his character and professional reputation in his
employment and opportunities to gain employment, States, counties, and municipal
areas Plaintiff resided, business clients and customers, financial, telephone, and other
institutions Plaintiff conducted business for his livelihood, family, friends, and Cyber
attacks that Defamed Plaintiff right to pursuit of happiness in the United States, and
abroad. Plaintiff is Placed on a Government Watch List, and given to Truthfinder
Internet Search Site. Additionally, Defendants, and those who aided Defendants
violated, CODE OF FEDERAL REGULATIONS, regarding "USE AND DISSEMINATION
RESTRICTIONS ", Described in TITLE 28 (CFR) SECTION 50.12, and apply to both
governmental and nongovernmental entities. Plaintiff incorporate Paragraph (99)
regarding his damages.

Wherefore, Plaintiff respectfully prays for the following relief:

1.   For on-going compensatory damages in an as-yet undermined amount;

2.   For punitive damages on Plaintiff's federal claims in an as-yet to be determined amount.

3.   For a jury trial on all issues so triable.

4.   For reasonable costs.

5.   For pre- and post judgment interest; and

6.   For such other further relief as the court may deem just and proper.

Respectfully Submitted,

Tony R. Little,  Pro Se
1370  Ferguson Ave.
Pagedale, Missouri 63133
573-213-0057